**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

---

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

August 13, 2024

<u>BY ECF and E-Mail</u>

The Hon. Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *United States v. Ramsey Orta*, 20 Cr. 429 (AMD)

Dear Judge Donnelly,

    We write in anticipation of the sentencing of Ramsey Orta, scheduled for September 5, 2024, to respectfully urge the Court to impose a sentence of time served on the single count of gun possession.

    Mr. Orta was raised in a home that the term "broken" understates. All throughout his youth, he suffered physical, emotional ███████ abuse and was shuffled from foster homes to group homes to juvenile detention centers. There was not a single stable adult in his life. He took refuge in the streets and drug use by the time he was ten years old. His significant mental health and chronic physical health issues are a direct result of these early traumas.

    Almost exactly ten years ago, Mr. Orta had begun, at age 22, to turn his life around – he was in a stable relationship, with a young daughter and a full-time landscaping job – when he witnessed and recorded the killing of Eric Garner by the NYPD. His video of the fatal interaction between officers and Eric Garner helped inspire the Black Lives Matter movement. However, it also tore Mr. Orta's life apart, as he struggled to navigate the resulting PTSD and survivor's guilt on top of being the constant target of police harassment and online threats.

    Despite all this, Mr. Orta has continued to persevere against the odds. Over the years, he has tried to devote himself to activism and journalism as an attempt to make something positive from the awful killing of his friend by the police. And while he has fallen in significant ways during this time, including his possession of the gun in this case, he has also had exceptional triumphs. These include publishing his first book, stopping his abuse of alcohol and hard drugs, and recognizing how badly he needs trauma-based therapy to stop the cycle of anger and abuse in himself and in his family.

Mr. Orta has been detained at Rikers Island for the last year on a new state case. He has been threatened, beaten, suicidal, and surrounded by violence and drugs. But even in the face of all of this, he continues to be committed to change. He has earned certificates in construction and OSHA. He has consistently taken his prescribed psychiatric medications to manage his anxiety, depression and PTSD, and worked on his anger issues. Further incarceration is not needed to punish or deter him, and it will not serve to rehabilitate him, because he cannot receive the mental health care he needs in prison.

We enclose for the Court's further consideration in connection with sentencing: Mitigation Video (Exhibit A); Orta Video of the killing of Eric Garner (Exhibit B).[1]

## I. FACTUAL BACKGROUND

### A. Personal History

#### 1. *1991 to 2014: Abandonment, Abuse, and Mental Health Issues*

Ramsey Orta was born on September 18, 1991, and almost immediately abandoned by both his parents, who were never married, and who split up soon after Ramsey was born. PSR ¶ 47. His father never parented him. His mother, while more physically present, was almost always high or drunk, and was often physically and emotionally abusive to Ramsey and his younger half-brother, Jaime. *Id.* ¶ 48. The family lived with his mother's parents in a small apartment in the Baruch Houses NYCHA projects on the Lower East Side. In the 1990s and early 2000s, the area around their housing project was crime-ridden, drug-infested, and violent.

It was no better inside the apartment. It was a broken, dysfunctional home. *See* Exhibit A, Mitigation Video, at 2:00-7:20. The adults who were supposed to protect Ramsey and be role models for him instead transgressed every norm and boundary. *See id.* at 1:10-1:20. His grandparents sold drugs and ran sex workers out of the family apartment. They let the sex workers tease Ramsey, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ His mother beat him with her hands and with objects. As further punishment, she also locked him in a dog cage with his little brother, locked him in the bathroom for extended periods, and verbally abused him for the smallest disobedience. PSR ¶ 49; Exhibit A at 3:48-4:55. His mother's husband (Ramsey's stepfather) beat her in front of Ramsey. PSR ¶ 49.

His mother and her whole side of the family (including his grandparents) regularly used drugs, ranging from cocaine to PCP to acid, in front of Ramsey from the time he was a small child. *Id.* This included his stepfather, who, when he was not high, showed Ramsey affection, but then would get drawn back into his

---

[1] These exhibits are filed by thumb drive to the Court and government.

mother's cycle of substance and domestic abuse. *Id.* To get Ramsey to go to sleep and leave her alone, his mother frequently gave him hard alcohol to drink, starting at about age eight. *Id.* ¶ 63. His cousins first gave him marijuana when he was nine years old. *Id.* Vicodin soon followed, again from his own mother. *See* Exhibit A at 11:13-11:43. His mother and stepfather also stood watching ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 5:41-7:10. His mother would have sex with men in front of him. None of the other adults in the house protected him. *See id.* at 3:43-3:48.

When Ramsey reported the abuse at school, ACS would sometimes intervene. Because of his mother's abuse and the rampant family drug use, Ramsey was repeatedly placed in foster care, including with this aunt, and group homes by ACS. PSR ¶ 49; Exhibit A at 8:30-9:52. He lived with two foster families and at seven different group homes before he was 16. PSR ¶ 49. His mother would briefly regain custody of him, and then lose it again. *Id.* Ramsey has described his childhood as like "bumper cars." The group homes were no more stable than his mother's apartment. At the group homes, he experienced serious physical abuse from staff, who would have the kids fight each other and bet on the fights, as well as using physical force to discipline them. *Id.* In foster care, he was often shunted to the side. Ramsey felt like no one was protecting him from what he was experiencing; they would just pass him off to someone else before returning him back to the horrific abuses of his family home. *See* Exhibit A at 5:00-5:35.



(Foster home, circa 2001, Ramsey Orta pictured on the left)

During the periods when his mother would regain custody of him, Ramsey would increasingly spend his time in the park across the street from the projects to escape the chaos at home. He was first hassled by the NYPD when he was just 11 years old. He was hanging out with other kids in the park after dusk, when police officers approached and asked the kids to show ID. None of the kids had ID, but, unlike the other kids' parents, Ramsey's mom did not respond to phone calls from the police, so he slept in a jail cell overnight. From then on, Ramsey knew to be

wary of police officers. His first real "arrest", at age 13, was for throwing rocks. The other kids he hung out with started to become his only stable family, the only people he could trust. *See id.* at 1:20-1:23.

It was also around this time that he was first diagnosed with mental health issues. PSR ¶ 60. In 2001, at age 11, a social worker at one of the group homes referred him to a psychologist who diagnosed him with depression. *Id.* He began to self-medicate for all the pain and disturbing memories with ecstasy, at age 13, and continued using it almost daily for the next sixteen years. *Id.* ¶ 63; Exhibit A at 12:30-13:45. At age 14, he was diagnosed with an anxiety disorder. PSR ¶ 60. His paternal uncle tried to help him get into an all-boys school in Pennsylvania where he would have more structure and stability. However, his mother refused to provide his birth certificate or other documents, so he could not be enrolled.

Despite being extremely intelligent and a gifted writer and artist, Ramsey dropped out of high school because of the total instability at home, which did not allow him the opportunity to remain at one school for more than a few months at a time, to do homework in a quiet environment, to have food to eat when he got home, or even to know if he would be let in the house at night by his mother. After too many nights being either hit by his mom or locked out of the house by her, at age 15, he tried to commit suicide by swallowing a bottle of his psychiatric medication. *Id.* ¶ 61.

When that didn't work, he escaped by moving to the streets. Exhibit A at 10:00-10:57. He began to steal and to sell drugs to support himself. PSR ¶¶ 28, 32. But the chaos inside his head only worsened, and he began to self-medicate with a daily mixture of ecstasy, marijuana, PCP and alcohol. *Id.* ¶ 63; Exhibit A at 11:13-11:43. The caseworkers who helped him in his early criminal cases referred him for mental health treatment, where he was diagnosed as schizophrenic, and given additional medications. PSR ¶ 60. However, he never received consistent counseling for his traumas.

When he was in his late teens, his mother and stepfather moved out of his grandparents' apartment in Manhattan to Tompkinsville in Staten Island, a small, violent, poor area. Ramsey relocated to Staten Island as well and was back and forth between the streets and his mother's apartment. He had almost daily contact with the police, bouncing in and out of Rikers Island on relatively minor offenses. His stepfather passed away from cancer in his 30s, and Ramsey lost the only quasi-functional parental figure that he had. Beginning at age 18, he regularly drank a large quantity of Remy Martin every day to ease the pain he felt. *Id.* ¶ 63.

Despite this, he tried hard to be productive and create his own stable environment. He learned how to do landscaping work and did odd jobs until he got hired full-time by a landscaper. He moved in with his daughter's mother, Chrissie

Ortiz, in Staten Island, and spent as much time as he could with his young daughter, A. For the first time in his life, things seemed to be getting better.

2. *Witness to the Killing of Eric Garner by NYPD in 2014*

On the afternoon of July 17, 2014, when he was 22 years old, Mr. Orta recorded the death of his friend Eric Garner. *See* Exhibit B, Orta Video of the Killing of Eric Garner. Ramsey first met Eric Garner when he moved to Staten Island in his late teens. He looked up to Eric Garner as a calming father figure in the neighborhood who welcomed Ramsey to his new community. Ramsey's affinity with Eric Garner took root in part because Eric's history mirrored Ramsey's own struggles. Both men were caring and motivated people who by circumstance felt forced to rely on the streets to get by. Eric supported himself by selling "loosies" (individual cigarettes) in a park in Tompkinsville. Ramsey would often stop by the park in the morning and have a coffee with Eric on his way to his landscaping job, or chat with him after picking up his daughter from school in the afternoon.

On July 17, Eric Garner lived up to his reputation as a caring father figure when he intervened to break up a fight between two men in the park.[2] Nonetheless, when the police ran up, they accused Eric Garner of having just sold loose cigarettes, refused to listen to his pleas, put him in a chokehold, killed him,[3] and left his body on the sidewalk in handcuffs. *See* Exhibit B.

Just a week earlier, Mr. Orta had recorded the police beating a man on the sidewalk of the same street while passersby begged them to stop.[4] Because of this, Mr. Orta was ready to pull out his phone and start recording the interaction which led to Eric Garner's death. Hoping to bring attention to the police brutality in his community, Mr. Orta shared the video with the NY Daily News.

Mr. Orta's video of Eric Garner's killing caused an outpouring of grief and anger among the public and helped energize the nationwide movement against police brutality, Black Lives Matter.[5] Eric Garner's dying words "I can't breathe," which he uttered repeatedly while NYPD Officer Pantaleo choked him and then knelt on his face as he lay dying, became a rallying cry that mobilized people across the country to fight to hold the police accountable for their treatment of black and brown people.[6]

---

[2] *See* Josh Sanburn, *Behind the Video of Eric Garner's Deadly Confrontation With New York Police,* TIME (July 22, 2014), https://time.com/3016326/eric-garner-video-police-chokehold-death/.

[3] *See* Andy Newman, *The Death of Eric Garner and The Events That Followed*, N.Y. Times (Dec. 3, 2014), https://www.nytimes.com/interactive/2014/12/04/nyregion/04garner-timeline.html#/#time356_10536 (noting that on August 1, 2014, the New York City Medical Examiner ruled Eric Garner's death a homicide).

[4] Josh Sanburn, *supra* note 2 (video of police beating embedded in article).

[5] *See* Jon Schuppe, *From Eric Garner to George Floyd: Protests reveal how little has changed in 6 years,* NBC News (May 31, 2020), https://www.nbcnews.com/news/us-news/eric-garner-george-floyd-protests-reveal-how-little-has-changed-n1220501.

[6] *See* Vivian Yee, *'I Can't Breathe' Is Echoed in Voices of Fury and Despair*, N.Y. Times (Dec. 3, 2014),

Despite Mr. Orta's video energizing a nationwide civil rights movement, because of the intense scrutiny it directed towards the NYPD, he has also been the repeated target of harassment by law enforcement.[7]



3. *Activism and Harassment*

After Eric Garner's death, and up until his incarceration in 2017, Mr. Orta was heavily involved with civil rights activism, helping bring to light and ameliorate the abuses his community faces. Specifically, Mr. Orta was part of WeCopwatch, a nationally recognized civil rights organization whose mission it was to both stop police brutality and empower communities across the country to defend themselves against infringements on their civil and human rights. His work with WeCopwatch was documented in the documentary film *Copwatch*, which premiered at the Tribeca Film Festival in 2017.



---

https://www.nytimes.com/2014/12/04/nyregion/i-cant-breathe-is-re-echoed-in-voices-of-fury-and-despair.html.
[7] *See, e.g.,* Chloe C. Jones, *Fearing For His Life*, The Verge (Mar. 13, 2019),
https://www.theverge.com/2019/3/13/18253848/eric-garner-footage-ramsey-orta-police-brutality-killing-safety.

As part of his activism, Mr. Orta was also interviewed by numerous news outlets to discuss what happened the day Eric Garner died and why he believes filming the police is so important to holding them accountable. This included interviews with TIME magazine, New York Magazine, the BBC, Democracy Now, and The Verge, among others. Likewise, Mr. Orta traveled the country with WeCopwatch, speaking at events and participating in trainings on how to safely film the police so as to raise awareness and train the next generation of civil rights activists. Mr. Orta also spoke at a professional legal conference and at colleges on both coasts.

These interviews and speaking engagements felt extremely important to Mr. Orta, but they were no easy feat, as, on each occasion, Mr. Orta was forced to relive and sometimes rewatch Eric Garner's death. He suffers from immense survivor's guilt for not stepping in and trying to stop the police, and from having lived, while Eric died. *See* Exhibit A at 19:12-20:35. Mr. Orta has repeatedly stated that he does not regret filming and publishing the death of his friend, Eric Garner. But he does regret attaching his name to the video, rather than remaining anonymous.

Mr. Orta has also been the subject of intense scrutiny and harassment by law enforcement ever since the Eric Garner video was published in the *Daily News* and went viral. One of the most harrowing instances that Mr. Orta faced was finding rat poison in his food at Rikers Island while he was awaiting release on bail in 2016. The City settled out of court with Mr. Orta and 20 other people incarcerated in Mr. Orta's unit who received the poisoned food.[8]

This time of activism and harassment, following from Eric Garner's death, has compounded the trauma Mr. Orta experienced on that July day in 2014, and has left him frightened, fragile, and traumatized. *See* Exhibit A at 22:20-23:10.

### 4. PTSD and Paranoia

Following the death of Eric Garner, Mr. Orta was diagnosed with PTSD. PSR ¶ 60. This came on top of the conditions he developed from a childhood of trauma and neglect, which include depression, anxiety, bi-polar 1 disorder, and schizophrenia. *Id.* As discussed above, Mr. Orta has also been forced to continuously relive the experience of watching his friend die through interviews and speaking engagements. He has expressed regret that he was not able to do more to intervene. However, he weighs this against what might have happened to his own life, and the consequences for the movement against racism and police brutality if the video had never been made.

---

[8] *See* Andrew Keshner and Larry McShane, *21 Rikers inmates get $378G from city after vomiting from meatloaf they say was tainted with rat poison*, N.Y. Daily News (April 7, 2018), https://www.nydailynews.com/2017/08/31/21-rikers-inmates-get-378g-from-city-after-vomiting-from-meatloaf-they-say-was-tainted-with-rat-poison/?clearUserState=true.

Regardless, no amount of awareness raised by his video changes what Mr. Orta witnessed and the effect it has on his mental health. As is well documented, witnessing police brutality, especially the death of a friend or loved one, has profoundly negative effects on a person's wellbeing and no doubt has contributed to the troubled life Mr. Orta has led in the last decade.[9] *See also* Exhibit A at 19:30-20:35, 22:20-23:00. He has not yet had the opportunity to participate in sustained trauma-based counseling for either the trauma of Eric Garner's death or the multiple traumas of his childhood. *See* Exhibit A at 13:47-14:00.

Despite all these hardships, Mr. Orta continued to give interviews with the press and maintain connections with the activist community. In fact, while he was incarcerated in 2019, he gave an interview with *The Verge* that was a finalist for the Pulitzer Prize.[10] In this interview, Ramsey discusses the panic that grips him nightly, as he tries to discern reality from his nightmares. The interviewer observed that "[p]aranoia and fear form their own prison, one Orta is likely to live in for the rest of his life."[11]

Later that year, over 1200 people signed on to a campaign to have Mr. Orta released early back into the community. Many people chose to include notes about their interactions with Ramsey which speak to his resiliency in the face of his trauma and mental anguish. These letters came from as far afield as New Zealand, and discuss Ramsey as kind, intelligent, and insatiably curious. Although Mr. Orta has struggled most of his life, especially so after he was inadvertently made famous because of witnessing his friend's death, he continues to find it within himself to fight, reflect, and better himself through it all.

5. *Physical Health Issues*

Born extremely premature to a drug-addicted mother, Ramsey also has struggled with physical health issues his entire life. From the time he was young, he has had asthma and needed to use an inhaler. PSR ¶ 56. He was diagnosed with Fibromyalgia at age 15, because of which he suffers chronic lower back pain and cannot stand for extended periods. *Id.* ¶ 57. Fibromyalgia is rarely diagnosed in someone so young and is thought to be linked to extreme stress, anxiety and

---

[9] *See* J. Luke Wood, *When Watching Footage of Police Brutality Begets Trauma*, Psychology Today (Feb. 2, 2023), https://www.psychologytoday.com/us/blog/the-psychology-of-racial-equity/202302/when-watching-footage-of-police-brutality-begets-trauma; Joshua Nevett, *George Floyd: The personal cost of filming police brutality*, BBC (June 11, 2020), https://www.bbc.com/news/world-us-canada-52942519; Camille Squires, *What Happened to the Witnesses*, Intelligencer (Jan. 31, 2022), https://nymag.com/intelligencer/2022/01/people-who-filmed-police-killings.html; Constantine Gidaris, *What it takes to record a Black person's death,* The Conversation (June 10, 2020), https://theconversation.com/what-it-takes-to-record-a-black-persons-death-140045.

[10] *See Finalist: Chloé Cooper Jones, freelance reporter, The Verge,* The Pulitzer Prizes, https://www.pulitzer.org/finalists/chloe-cooper-jones-freelance-reporter-verge (last visited July 29, 2024).

[11] Chloe C. Jones, *supra* note 8.

trauma.[12] He self-medicated for this physical pain (as well as for his mental health issues) with ecstasy and marijuana for years. ████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

### B. Instant Offense Conduct

On September 23, 2020, Mr. Orta and a friend were parked in front of a fire hydrant in Williamsburg, Brooklyn, listening to music and sitting in their car. The NYPD pulled up and, within seconds, had Mr. Orta and his friend out of the car and were conducting a full search. They found a loaded gun in his waistband. Mr. Orta was initially charged in state court with gun possession, but the charges were federalized on September 29, 2020. On February 22, 2023, Mr. Orta pleaded guilty to the single count in the indictment of possessing a gun after previously having been convicted of a felony.

### C. Pretrial Violations and Progress

Mr. Orta began federal pretrial supervision on January 21, 2021, after completing a state parole violation sentence. He initially went to live with his ex-girlfriend in New Jersey, in the hope of staying away from the streets of New York City. However, it was understandably too hard on her to have Mr. Orta living there when they were no longer romantically involved, so she asked him to leave. With nowhere else to go, in early February 2021, he went back to the Baruch Houses apartment on the Lower East Side where he had spent his youth. His mother had returned here and was living with his much younger half-brother, then 12 years old. Upon arriving, he found a filthy house with pills everywhere and no unspoiled food.



Living in his mother's apartment returned Ramsey to the stresses of his

---

[12] *See Fibromyalgia*, National Institute of Health, https://www.niams.nih.gov/health-topics/fibromyalgia (last visited 6/25/2024).

childhood, but he did his best. He was on house arrest with electronic monitoring for approximately six months, not even permitted to leave the building to walk his dogs. During this time, he had no issues with the conditions of his release, except for using marijuana, which the Court eventually approved, consistent with his medical marijuana prescription. PSR ¶ 4. He attended drug treatment consistently. He never tested positive for any drug except marijuana. He had steady work as a dog breeder, freelance journalist and speaker. *Id.* ¶ 67.

On July 9, 2021, the Court reduced Mr. Orta's bail restrictions from house arrest to a curfew, monitored electronically. Mr. Orta had difficulties hearing the electronic curfew check-ins when he was asleep, so the Court modified the curfew times on several occasions so that the notifications would not come in the middle of the night after he was already asleep. *Id.* ¶¶ 5-6.

On November 6, 2021, while on pretrial supervision, his first book was published: *A Shot in History: The Poisoned System*. The book uses the killing of Eric Garner as a starting point for discussing police brutality, the criminal justice system, and racism. Ramsey appeared on multiple podcasts and radio interviews to discuss the book.





In December 2021, defense counsel asked Pretrial to refer Mr. Orta for mental health treatment, and he was referred to First Light Psychological Services. He was eager to work on his anger management issues, talk about the stresses of his housing instability, and find healthier ways to relate to his romantic partners.

In February 2022, Pretrial filed two bail violation memoranda, informing the Court that (1) Mr. Orta had been discharged from First Light, (2) he had repeatedly missed the automated morning curfew check-in calls, and (3) he had been arrested (and released) on two I-Cards. Counsel explained to the Court that (1) the therapist he had been assigned at First Light was not a good fit for him, having repeatedly probed the topic of ███████████████████, even after he stated he did not want to discuss it, so he had switched to a male therapist at another counseling center; (2) the majority of the "missed" calls came outside of the curfew period of 8 PM to 8

AM; and (3) all charges relating to these I-cards were subsequently dismissed.

The Court advised Mr. Orta that, while it understood the context of each allegation was complicated, he had to try to stay out of trouble while on supervision. For the next year, from February 28, 2022, to January 2023, Mr. Orta had no further issues with the conditions of his release. He attended both substance abuse and mental health treatment consistently.

On January 29, 2023, Mr. Orta was arrested on a domestic violence charge stemming from an altercation with a girlfriend. *Id.* ¶ 9. That charge was subsequently resolved with a plea to a misdemeanor.

D. Arrest and Custody at Rikers For The Past Year

On June 9, 2023, Mr. Orta was arrested on state gun and drug charges and remanded to Rikers Island. He felt abandoned and betrayed. His depression was so severe that the 18B lawyer he was first assigned asked the judge to order that he be sent for a competency evaluation, pursuant to Criminal Procedure Law 730. He started having suicidal ideation. *Id.* ¶ 61. He lost weight. He thought he had left Rikers Island and all that he had suffered there behind him.

He returned to a Rikers even worse than the one he had left three years before. The July 2023 report by the court-appointed monitor in the federal litigation concerning conditions on Rikers painstakingly documents the extreme level of violence and the frequent use of excessive force by officers. *See Nunez v. City of New York,* ECF No. 557, 11-CV-5845 (LTS) (S.D.N.Y.) (filed July 10, 2023). "The current state of affairs and rates of use of force, stabbings and slashings, fights, assaults on staff, and in-custody deaths remain extraordinarily high—they are not typical, they are not expected, they are not normal." *Id.* at 17. Officers bring in drugs and weapons and sell them to inmates. The conditions are filthy. No psychological counseling is available. He has been beaten up by gang members, threatened by officers, and repeatedly placed in protective custody.

Despite all of this, Ramsey has sought to make the best of this terrible situation. He is taking his prescribed anti-depressant and anti-anxiety medications. He is working on art projects, including for the Social Justice Collaboration Quilts Project. *See* Exhibit A, at 18:12-19:20. He also has been steadily earning certificates in construction and HVAC so that he can secure a law-abiding job upon release.





Mr. Orta has been in frequent discussions with the Fortune Society about how he can obtain stable housing when he is released so that he need not return, yet again, to his mother's apartment. He also has been reading about Dialectical Behavioral Therapy, a form of therapy specifically designed to help patients control intense emotions that drive them to take dangerous actions. This includes developing "distress tolerance" to prevent yourself from doing something you will later regret. When he is released this time, he wants to have tools he really needs to maintain a stable life.

II.  **A Sentence of Time Served, Followed By A Term of Supervision With An Initial 90 Days In The Halfway House And A Special Condition of Trauma-Focused Mental Health Care Will Be Sufficient, But Not Greater Than Necessary, To Serve Each of The Interests of Sentencing In The Particular Circumstances of This Case.**

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). However, in determining the sentence, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted).

Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to provide just punishment and afford adequate deterrence. *See* 18 U.S.C. § 3553(a). The statute also requires the sentencing court to consider the need to provide the defendant educational training, medical care, or other treatment in the most

effective manner, the kinds of sentences available, the applicable Guidelines range and the need to avoid unwarranted sentencing disparities. *See id.*

      A.      <u>Correctly Calculated Guidelines' Range</u>

The defense respectfully submits that the correctly-calculated advisory Guidelines' range is 30 to 37 months of imprisonment. The government concurs with this calculation.

The PSR calculates Mr. Orta's Guidelines' range as 37 to 46 months, because it does not accord him the two-point reduction for acceptance of responsibility, despite his guilty plea. As noted in the defense objection to the PSR, filed June 17, 2024, Probation's calculation is based on Mr. Orta having been *arrested* three times while out on bond on this case. This is not an appropriate basis for denial of acceptance of responsibility as to *this* felon-in-possession case. In this case, Mr. Orta allocuted fully, and in so doing mooted his pending, potentially meritorious, suppression motion, while also sparing the government significant resources in having to litigate that motion.

Moreover, denial of acceptance of responsibility is also not warranted given the specific circumstances of those arrests. As to the first arrest, in February 2022, all charges were dropped. As to the second arrest, in January 2023, it arose in entirely different circumstances, as it was a domestic violence incident. Mr. Orta pled guilty to that charge, received a sentence of 364 days in custody, and is already receiving two criminal history points for that case. *See* PSR ¶ 36. As to the third arrest, Mr. Orta has not been convicted of any charge in that case; he cannot be denied acceptance points on the basis of a case for which he is presumed innocent. *See id.* ¶ 41.

With the inclusion of the two-point reduction for acceptance of responsibility, Mr. Orta's total offense level is correctly calculated at 12, lowering his Guidelines' range from 37-46 to 30-37 months of imprisonment.

      B.      <u>Nature and Circumstances of the Offense and History and Characteristics of the Defendant</u>

The Guidelines in this case fail to account for Mr. Orta's individual circumstances, in particular his medical and mental health conditions, his extreme childhood neglect and abuse, and the trauma of witnessing his friend be killed by the police. Each of these is directly relevant to the Court's consideration of the Section 3553(a) factors.

Ramsey Orta is a complicated, flawed, brilliant, courageous person, who has suffered immense trauma and made many mistakes in his life, but also done a tremendous amount of good. He hasn't yet had a real, sustained chance to show who

he can be. His period out of custody on pre-trial release in this case, from January 21, 2021 to June 9, 2023, was his longest period out of an institutional setting since he was 13 years old. He hasn't received sustained, real trauma-based therapy. His chronic medical conditions, not consistently treated because of his being in and out of jail, have left him exhausted. He has no trustworthy family to whom he can turn.

But, despite all of his mistakes and the crimes he has committed, his extraordinary promise and strength shines through. He has stopped using hard drugs and abusing alcohol to self-medicate, basically on his own. This is in the face of having been addicted since he was nine or ten years old. He recognized while on pretrial release in this case how badly he needed anger management and how important it is for him to stop the cycle of domestic abuse in his own romantic relationships. Recognizing these things, he voluntarily sought out treatment to address them. He knows that this is an issue he has a long way to go on. But he wants, desperately, to do that work. He knows that he can be a different, healthy partner and father to his two children, if given the chance to apply himself to healing his wounds.

He is also focused on obtaining further, practical job skills. Ramsey wants to return to the stability he had achieved at age 22, before Eric Garner's death, when he was working not in the streets, but as a landscaper and as a construction worker. He has continued to write and draw. Most importantly, as the mitigation video shows, in his own words, he doesn't want the street life anymore. *See* Exhibit A at 14:28-17:20.

The offense conduct for which Mr. Orta is being sentenced, having a gun in his waistband when stopped by the police for being parked in front of a fire hydrant, is serious. Mr. Orta has struggled for years with feeling unsafe. He is small and he is well-known on the streets. But that doesn't excuse his behavior. He knows that possessing a gun only leads to more violence and more danger, not to safety.

C. <u>Conditions of Custody</u>

In determining whether and how much longer Mr. Orta needs to be incarcerated for the crime of gun possession, the Court should also weigh the increased danger and diminished conditions to which he has been subjected over the last year at Rikers Island when determining the "total harm and benefits to prisoner and society" that additional imprisonment would yield. *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant*); see also United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case");

*United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

There is little reason to believe that were Mr. Orta moved to a federal correctional facility that his situation would improve. Neither consistent medical care nor skilled mental health care would be available to him in the BOP. This Court is well acquainted with the severe problems with medical and mental health care at the MDC. Unfortunately, these problems are not limited to Brooklyn. As courts in this District and the Southern District of New York have recognized, the already meager medical and mental health services theoretically offered within the BOP have been significantly reduced, if not eliminated in the wake of COVID and related staffing shortages.[13] *See also, e.g.*, *United States v. Nelson*, 20 Cr. 3 (KPF) (S.D.N.Y. 2020), ECF No. 286 (Sent. Tr.) at 39-40 (recognizing that BOP facilities are "still processing the effects of the pandemic and their consequent effects on programming" and, as a result, many inmates are "not doing anything other than" being "warehoused" during their time).

Indeed, just like at the MDC, BOP medical departments across the country are extremely short staffed: a 2023 DOJ report noted that only 69% of BOP medical officer positions were filled, while 89% of BOP facilities had one or more clinical positions vacant, with some facilities having no medical officers at all.[14] A 2022 DOJ inspector general report noted that the "BOP did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."[15] The "BOP did not have systems to measure or track" "how long" a person had to wait to receive care after a cancelled appointment and why there was a "frequent need" to cancel appointments.[16] Thus, "it is difficult for the BOP to determine whether [people] are receiving care within the required community standard."[17]

The mental health care in BOP for someone who needs trauma counseling, not just psychiatric medications, is even worse than the medical care. Due to budgetary, staffing, overcrowding, and core competency issues, the Bureau of Prisons is ill-equipped to provide Mr. Orta with the services and treatment that he

---

[13] *See* Erik Ortiz, *Staffing Shortages and Deficient Training Leave First Step Act Floundering, Federal Prison Employees Say*, NBC News (July 28, 2022), https://www.nbcnews.com/news/us-news/staffing-shortages-deficient-training-leave-first-step-act-floundering-rcna40210 (describing how programming at BOP facilities has been severely cut back while employees are diverted to other correctional officer duties during ongoing staffing shortages).

[14] *See Review of Personnel Shortages in Federal Health Care Programs During the Covid-19 Pandemic*, Pandemic Response Accountability Committee (Sept. 2023), https://www.pandemicoversight.gov/media/file/healthcare-staffing-shortages-report.

[15] *Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts awarded to the University of Massachusetts Medical School*, DOJ, Office of the Inspector General (March 2022), https://oig.justice.gov/sites/default/files/reports/22-052.pdf.

[16] *Id. at 13.*

[17] *Id.*

needs, let alone "in the most effective manner."[18] Although limited, BOP data shows that, "as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's FY 2016 Performance Budget Congressional Submission cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness."[19]

In 2006, the United States Department of Justice, Bureau of Justice Statistics, published a report that summarized the lack of mental health treatment in the Bureau of Prisons.[20] The report showed that 43.6% of males in federal prison have a mental health problem,[21] yet only 15.1% had "professional mental health therapy."[22] According to the report "[t]aking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail."[23]

And these gaping holes in adequate care have only grown worse since the Department of Justice raised concerns nearly twenty years ago. Just three months ago, a class action lawsuit detailing systemic, substandard mental healthcare in a Bureau of Prisons facility in Virginia was filed in the United States District Court for the Western District of Virginia, stating that "it is the institutional culture [of the Bureau of Prisons] to neglect the mental health needs of its residents." *See M.L, et al v. Garland, et al.*, 24-cv-17, ECF No. 1 (W.D.V.A. March 26, 2024).[24]

Even assuming the best-case scenario, where Mr. Orta is given medications on a pill line semi-regularly, medication alone, absent a therapeutic environment, is insufficient and ineffective in treating underlying psychiatric and psychological conditions giving rise to criminal conduct. The relationship between the therapist and the client, the "therapeutic alliance," is one of the most important factors in treatment success.[25]

As one court described when imposing a significant downward variance at a recent sentencing:

---

[18] *See Treatment Denied: The Mental Health Crisis in Federal Prisons,* The Marshall Project (Nov. 21, 2018), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons.

[19] *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, Office of the Inspector General (July 2017), https://oig.justice.gov/reports/2017/e1705.pdf at ii.

[20] *See Special Report: Mental Health Problems of Prison and Jail Inmates,* Bureau of Justice Statistics (Dec. 2006), https://www.bjs.gov/content/pub/pdf/mhppji.pdf.

[21] *Id.* at 4.

[22] *Id.* at 9.

[23] *Id.*

[24] https://www.washlaw.org/wp-content/uploads/2024/03/USP-Lee-Filed-Complaint.pdf

[25] *See* J.L. Krupnick et al., *The Role of the Therapeutic Alliance in Psychotherapy and Pharmacotherapy Outcome: Findings in the National Institute of Mental Health Treatment of Depression Collaborative Research Program*, 64 J. OF CONSULT. CLIN. PSYCH. 532 (June 1996), https://pubmed.ncbi.nlm.nih.gov/8698947/.

> [T]he current state of the prison system is such that a lot of the programs that are most helpful to folks in your situation are not or may not be given in the designated facilities. And so the idea of sending you away for more than 25 months to a place with no programming, no treatment, and just incapacitation causes me concern.

*United States v. Nelson*, 20 Cr. 3 (KPF) (S.D.N.Y. 2020), ECF No. 286 (Sent. Tr.) at 38.

D.     Unwarranted Sentencing Disparity

A sentence without further incarceration would also avoid unwarranted sentencing disparities. Pursuant to 18 U.S.C. § 3553(a)(6), in determining a sentence that is sufficient, but not greater than necessary, the Court "shall consider" "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

In the Eastern District of New York, a below Guidelines, and even non-custodial, sentence for individuals convicted of gun possession is not at all uncommon, even in cases with far less mitigation than is present here. *See, e.g., United States v. Kyle Balkissoon*, 21-cr-186 (EK) (5 years of probation; guideline range of 70 to 87 months); *United States v. Rondelle Esters*, 21-cr-398 (EK) (sentenced to time served of approximately four months; guideline range of 30-37 months); *United States v. Maurice Mizrahi*, 22-cr-504 (DLI) (sentenced to 18 months; guideline range of 37 to 46 months); *United States v. Liggins*, 20-cr-133 (RPK) (sentence of time served of approximately three months; guideline range of 10 to 16 months); *United States v. Darnell Braxton*, 20-cr-237 (LDH) (sentence of 5 years of probation; guideline range of 30 to 37 months); *United States v. Belton Brabham*, 18-cr-186 (FB) (non-jail sentence; guideline range of 92 to 115 months); *United States v. Benjamin Council*, 18-cr-417 (MKB) (time served of about 8 days; guideline range of 33 to 41 months); *United States v. Christopher Manuel*, 18-cr-0627 (JS) (sentenced to time served of 1 day in custody; guideline range of 15 to 21 months); ); *United States v. Rodriguez*, 18-cr-0581 (LDH) (sentenced to 5 months in custody; guideline of 21-27 months); *United States v. Michael Willis*, 15-cr-472 (ARR) (5 years of probation with first 15 months on curfew; guideline range of 84 to 105 months); *United States v. Christopher Quinn*, 15-cr-210 (ENV) (5 years of probation with 6 months home confinement; guidelines range of 24 to 30 months); *United States v. Leylon Dey*, 15-cr-420 (RJD) (sentenced to 3 years of probation; guideline range of 30 to 37 months).

That is true even in cases with much more aggravated fact patterns than presented here. *E.g.*, *United States v. Dwayne Patterson*, 21-cr-524 (PKC) (person fired gun several times; guideline range of 51-63 months' imprisonment; sentenced

to time served of about 5 months); *United States v. David Wright*, 20-cr-351 (ENV) (30 months of imprisonment; person shot another person in the leg); *United States v. Matthew Ottey*, 19-cr-334 (MKB) (three years of probation when person shot gun in the air; guideline range of 57 to 71 months); *United States v. Raheem Boomer*, 17-cr-453 (ENV) (multiple shots fired; sentence of 6 months of home detention, with work permitted, and two years of supervised release).

### E. Punishment, Deterrence, and Rehabilitation

Of course, the fundamental question before the Court is what sentence will best punish, deter and rehabilitate Mr. Orta. We respectfully submit that a sentence without further incarceration, but with significant structure, including a step-by-step approach to re-entry with a focus on housing stability and highly-skilled mental health treatment targeted to his trauma and history of abuse, will best deter and rehabilitate Mr. Orta. Given his particular, individual circumstances, he has been punished sufficiently for this offense by his six months of total home incarceration and an additional six months on curfew.

An incarceratory sentence will not serve to deter – other than in the most basic sense of incapacitation – or rehabilitate Mr. Orta. He has served significant time in prison previously, which has only deepened his trauma and made it harder to build a stable, law-abiding life for himself. What he has never received is individualized support: skilled, focused trauma therapy that addresses his history and his conditions; stable housing so that he does not have to return to his family apartment or move in with a girlfriend; and consistent medical care for his chronic conditions to ameliorate his pain and fatigue.

The community is where Mr. Orta can receive medical and mental health care in the "most effective manner." *See* 18 U.S.C. § 3553(a)(2)(D). He has shown that he can hold down a stable job (and now has even more practical skills than he did prior to this incarceration). He dreams of raising therapy dogs to help other people who, like him, suffer from PTSD and are returning from incarceration. *See* Exhibit A at 25:45-26:12.

For all of these reasons, and all of those set forth above, we respectfully ask that the Court impose a time served sentence, to be followed by three years of supervised release, with special conditions that the first three months be served in the halfway house. This will allow Mr. Orta, in combination with the Fortune Society and our Federal Defender social worker, to secure stable housing outside of Staten Island or the Lower East Side, and allow him to identify an appropriate DBT program and begin attending it.

Thank you for your consideration of this information and these requests.

                                            Respectfully Submitted,

                                            /s/
                                          Deirdre D. von Dornum
                                          Justin Gravlee (Legal Intern)
                                          Federal Defenders of New York
                                          (718) 330-1210

Cc:    AUSA Jack Dennehy
        U.S. Probation Officer Ashtin Audain
        Ramsey Orta